UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

STARSTONE NATIONAL
INSURANCE COMPANY,

     Plaintiff,

v.                                                     Case No. 8:20-cv-2326-WFJ-CPT

GOLF ARGONOMICS SUPPLY
& HANDLING CO., GOLF
AGRONOMICS SAND &
HAULING, INC., and AMBER
CHAFIN, individually and in her
capacity as legal and natural guardian
of her minor sons J.S. and J.R.,

     Defendants,

_____/

## REPORT AND RECOMMENDATION

Before me on referral is Plaintiff StarStone National Insurance Company's (StarStone) motion for judgment on the pleadings. (Doc. 70). For the reasons discussed below, I respectfully recommend that StarStone's motion be granted.

I.

This action stems from an August 2020 motor vehicle accident involving Defendant Amber Chafin and an individual who is not a party to this litigation, Mark Welker. (Docs. 57, 69). At the time of the accident, Ms. Chafin was driving a car,

while Mr. Welker was operating a semi-truck owned by Defendant OST Leasing, Inc. (OST).  (Doc. 57 at 3–4); (Doc. 69 at 2).  Mr. Welker was also towing a semi-trailer owned by Defendant Flash Trucking, Inc. (Flash Trucking) and carrying cargo on behalf of Defendant Golf Argonomics Supply & Handling Co. (Golf Argonomics).  (Doc. 57 at 4); (Doc. 69 at 2).

As a result of the accident, Ms. Chafin allegedly suffered serious personal injuries.  (Doc. 57 at 4); (Doc. 69 at 2).  Not long after, Ms. Chafin initiated a state court action in Palm Beach County, Florida by filing a complaint against Mr. Welker, OST, and Flash Trucking (hereinafter, the Underlying Lawsuit).  (Doc. 57 at 5); (Doc. 69 at 2); (Doc. 57-1).  Ms. Chafin later amended her complaint to incorporate claims on behalf of her two minor sons, J.S. and J.R., and to add several defendants, including—as pertinent here—Golf Argonomics and a seemingly affiliated business, Golf Argonomics Sand & Hauling, Inc. (Sand & Hauling).[1]  (Doc. 57 at 5); (Doc. 69 at 3).  In her amended complaint, Ms. Chafin averred, inter alia, that the accident was caused by Mr. Welker's negligence, and that Golf Argonomics and Sand & Hauling were both negligent and vicariously liable for Mr. Welker's negligence.  (Doc. 57-3).  Ms. Chafin separately alleged that Flash Trucking negligently hired Mr. Welker, failed to properly train him, and negligently supervised and retained him.  *Id.*

---

[1] Ms. Chafin alleged in this respect that Flash Trucking, OST, Golf Argonomics, and Sand & Hauling shared the same physical address and the same officers "as if they were a single entity."  (Doc. 57-3).  Ms. Chafin also named two such officers as defendants in the Underlying Lawsuit.

At all times relevant to this action, Golf Argonomics and Sand & Hauling had three different insurance policies with three different companies.  The first was an automobile liability policy with Progressive Express Insurance Company (Progressive) (Doc. 57-7); (Doc. 57 at 7); (Doc. 69 at 3), and the second was a general liability policy with Wilshire Insurance Company (Wilshire) which had "an each occurrence limit" of $1,000,000.  (Doc. 57-8); (Doc. 57 at 7); (Doc. 69 at 3).  The third was a "Follow Form" excess liability policy[2] with StarStone, which was tied to Wilshire's policy and which had "an each occurrence limit" of $5,000,000 (Doc. 57-9); (Doc. 57 at 7); (Doc. 69 at 3); (Doc. 70 at 4).  Of import here, StarStone's excess policy afforded coverage to Golf Argonomics and Sand & Hauling in accordance with the same terms, definitions, conditions, limitations, and exclusions as those set forth in the "Followed Policy"—i.e., Wilshire's policy[3]—except where StarStone's policy provided otherwise.  (Doc. 57-9 at 32).

Although not entirely clear, it appears that both Progressive and Wilshire defended Golf Agronomics and Sand & Hauling in the Underlying Lawsuit with respect to Ms. Chafin's claims against them.  (Doc. 57 at 7); (Doc. 69 at 3); (Doc. 71 at 3).  StarStone, however, denied coverage to Golf Agronomics and Sand & Hauling,

---

[2] *See Desai v. Navigators Ins. Co.*, 400 F. Supp. 3d 1280, 1283 n.3 (M.D. Fla. 2019) (Jung, J.) ("A 'follow form' policy provides coverage in conformance with the same terms, conditions, and exclusions as those set forth in the followed policy, except where specifically provided otherwise.") (citations omitted).

[3] The parties agree that Wilshire's policy is the "Followed Policy."  (Doc. 70 at 5); (Doc. 71 at 6–7).

(Doc. 57 at 5); (Doc. 69 at 3), and did not participate in the Underlying Lawsuit (Doc. 71 at 4).

Golf Argonomics and Sand & Hauling, along with the other parties in the Underlying Lawsuit, ultimately resolved their dispute and agreed to the entry of final consent judgments in the case. (Docs. 57-4, 57-5, 57-6); (Doc. 57 at 6); (Doc. 69 at 3). In light of this agreement, the state court entered final consent judgments for Ms. Chafin and her minor sons in the amount of $23,355,000 to Ms. Chafin and $5,500,000 each to J.S. and J.R. *Id.* These final consent judgments, however, did not allocate specific amounts amongst the defendants. *Id.*

While the Underlying Lawsuit was still pending, StarStone commenced this action against Golf Argonomics and Ms. Chafin based on the Court's diversity jurisdiction, seeking to ward off any liability for the damages sustained by Ms. Chafin. (Doc. 1). StarStone has since twice amended its complaint, most recently to add Sand & Hauling as a Defendant.[4] (Docs. 57, 61). By way of the instant motion, StarStone now seeks a judgment on the pleadings, along with a finding that, among other things, its excess policy provided "no coverage" for any claims arising out of the August 2020 accident. (Doc. 70). In support of its position, StarStone points to the terms in its excess policy—particularly, an "Auto Liability Exclusion"—as well as the nature of the final consent judgments awarded to Ms. Chafin and her two children. *Id.* Ms.

---

[4] The parties stipulated that the other defendants in the Underlying Lawsuit which are not named in this action—i.e., Flash Trucking, OST and the individual officers—will be bound by the Court's coverage determination in this case. (Doc. 67).

Chafin filed a response in opposition to StarStone's motion (Doc. 71), to which StarStone submitted a reply (Doc. 76). Golf Argonomics and Sand & Hauling, however, did not respond to StarStone's motion and the time for doing so has elapsed. M.D. Fla. R. 3.01(d). The matter is thus now ripe for the Court's consideration.

## II.

Federal Rule of Civil Procedure 12(c) states that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). Motions for judgment on the pleadings under Rule 12(c) are governed by same standard as motions to dismiss brought pursuant to Rule 12(b)(6). *See Carbone v. Cable News Network, Inc.*, 910 F.3d 1345, 1350 (11th Cir. 2018) (citation omitted). Thus, in evaluating a Rule 12(c) motion, a court must accept the factual allegations in a complaint as true and must view them in the light most favorable to the nonmoving party. *See Cannon v. City of W. Palm Beach*, 250 F.3d 1299, 1301 (11th Cir. 2001) (citation omitted). A court need not, however, credit a nonmoving party's legal assertions. *See Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1304 n.12 (11th Cir. 2003) (citing *Honduras Aircraft Registry, Ltd. v. Gov't of Honduras*, 129 F.3d 543, 545 (11th Cir. 1997)). In the end, a Rule 12(c) motion may be granted when "no issues of material fact exist, and the movant is entitled to judgment as a matter of law[,]" *Ortega v. Christian*, 85 F.3d 1521, 1524 (11th Cir. 1996) (citing Fed. R. Civ. P. 12(c)), or when "the complaint lacks sufficient factual matter to state a facially plausible claim for relief that allows the court to draw a reasonable inference that the defendant is liable for the alleged misconduct,"

*Jiles v. United Parcel Serv., Inc.*, 413 F. App'x 173, 174 (11th Cir. 2011) (per curiam)[5] (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007)).

III.

StarStone posits several arguments in support of its motion for judgment on the pleadings. (Doc. 70). Before addressing the merits of these contentions, some background regarding the legal framework pertaining to insurance contracts is necessary.

The extent of coverage under an insurance policy is a question of law to be decided by a court. *Fireman's Fund Ins. Co. v. Tropical Shipping & Constr. Co., Ltd.*, 254 F.3d 985, 1003 (11th Cir. 2001) (citations omitted). Because this is a diversity action, Florida law controls the coverage determination. *Mid-Continent Cas. Co. v. Am. Pride Bldg. Co., LLC*, 601 F.3d 1143, 1148 (11th Cir. 2010).

Under Florida law, the terms in an insurance contract "are given their plain and ordinary meaning and read in light of the skill and experience of ordinary people." *Penzer v. Transp. Inc. Co.*, 545 F.3d 1303, 1306 (11th Cir. 2008) (citations omitted). When a clause in a policy is unambiguous, a court must interpret that clause "in accordance with the plain meaning of the language used so as to give effect to the policy as it was written." *Travelers Indem. Co. v. PCR Inc.*, 889 So. 2d 779, 785 (Fla. 2004) (citations omitted).

---

[5] Unpublished opinions are not considered binding precedent but may be cited as persuasive authority. 11th Cir. R. 36-2.

On the other hand, provisions that are "reasonably susceptible of more than one meaning . . . are ambiguous and construed in favor of the insured." *Progressive Am. Ins. Co. v. Steele*, 15 F. Supp. 3d 1240, 1247 (M.D. Fla. 2014) (citation omitted); *see also State Farm Mut. Auto. Ins. Co. v. Pridgen*, 498 So. 2d 1245, 1248 (Fla. 1986) (same) (citation omitted). Similarly, provisions that exclude or limit the liability of an insured are interpreted "more strictly" than provisions that furnish coverage. *Progressive Am. Ins. Co.*, 15 F. Supp. 3d at 1247 (internal quotation marks and citation omitted).

### A.

With these principles in mind, I turn to StarStone's first contention that the plain language of the "Auto Liability Exclusion" in its excess policy with Golf Argonomics and Sand & Hauling shields it from any coverage relative to Ms. Chafin's claims. (Doc. 57); (Doc. 57-9 at 10). Ms. Chafin counters that StarStone's excess policy is "clearly ambiguous" on this issue and therefore "requires a factual record." (Doc. 71 at 1–2, 6–8, 10–11).

To resolve the parties conflicting stances on the matter, I begin, as I must, with the language of the operative provisions in StarStone and Wilshire's respective policies. Section I of StarStone's excess policy—titled "Coverage"—states, in relevant part, that StarStone "will pay on behalf of the Insured [i.e., Golf Argonomics and Sand & Hauling] the sums in excess of the [t]otal [l]imits of . . . [Wilshire's policy] that the Insured becomes legally obligated to pay as damages." (Doc. 57-9 at 32). StarStone's excess policy additionally states—as alluded to above—that *"[e]xcept as otherwise*

*provided by . . . [StarStone's excess p]olicy*, the coverage follows the definitions, terms, conditions, limitations and exclusions of the [Wilshire policy]." *Id*. (emphasis added).

StarStone's excess policy and Wilshire's policy both contain automobile exclusions that differ in scope.[6] Wilshire's automobile exclusion denies coverage for "bodily injury . . . arising out of the ownership, maintenance, use[,] or entrustment to others of any . . . 'auto' . . . owned or operated by or rented or loaned to any insured." (Doc. 57-8 at 53`). StarStone's automobile exclusion, by contrast, states that its excess "[p]olicy does not apply to any liability, damage, loss, cost or expense arising out [of] the ownership, maintenance[,] or use of any auto." (Doc. 57-9 at 10).

StarStone's excess policy does not define the word "auto" and thus, by its terms (Doc. 70 at 6), adopts the meaning ascribed to that term found in Wilshire's policy (Doc. 57-9 at 32). Wilshire's policy defines the word "auto" as, inter alia, "[a] land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment." (Doc. 57-8 at 62).

Applying the above rules of construction to these provisions, I find that StarStone's automobile exclusion dictates the coverage determination in this action. This is because, as noted previously, the plain language of StarStone's excess policy makes clear that it only covers damages which surpass the limits of Wilshire's policy, except where the StarStone excess policy "provides otherwise." (Doc. 57-9 at 32). And since StarStone's automobile exclusion is not the same as Wilshire's automobile

---

[6] Ms. Chafin acknowledges that StarStone's excess policy "contains a broader . . . auto exclusion." (Doc. 71 at 7).

exclusion (i.e., it "provides otherwise"), StarStone's automobile exclusion controls. This reasoning not only coheres with the straightforward wording found in StarStone's excess policy, it is also consistent with the manner in which such "follow form" policies operate. *See Desai*, 400 F. Supp. 3d at 1283 n.3 ("A 'follow form' policy provides coverage in conformance with the same terms, conditions, and *exclusions* as those set forth in the followed policy, *except where specifically provided otherwise*.") (emphasis added) (citations omitted).

I additionally find that StarStone's automobile exclusion precludes StarStone from having to furnish any coverage for the August 2020 accident. As noted above, at a minimum, that exclusion safeguards StarStone from "any liability, damage, loss, cost[,] or expense *arising out [of]* the . . . *use of any auto*." (Doc. 57-9 at 10). Numerous courts in Florida have deemed the first highlighted phrase, "arising out of," to be unambiguous. *See, e.g.*, *Allstate Ins. Co. v. Safer*, 317 F. Supp. 2d 1345, 1350 (M.D. Fla. Apr. 16, 2004) ("[T]he phrase 'arising out of the . . . use of an auto' is not ambiguous.") (collecting cases); *Sparta v. Colareta*, 990 F. Supp. 2d 1357, 1368 (S.D. Fla. Jan. 6, 2014) (same) (citation omitted); *Sunshine State Ins. Co. v. Jones*, 77 So. 3d 254, 257 (Fla. Dist. Ct. App. 2012) (same) (citations and footnote omitted). Many courts in Florida have also ruled that the "arising out of" language should be construed broadly. *See, e.g.*, *Taurus Holdings, Inc. v. U.S. Fidelity & Guar. Co.*, 913 So. 2d 528, 539 (Fla. 2005) ("The term 'arising out of' is broader in meaning than the term 'caused by' and means 'originating from,' 'having its origin in,' 'growing out of,' 'flowing from,' 'incident to'

or 'having a connection with.'") (internal quotation marks and citation omitted));[7] *see also Gov't Empls. Ins. Co. v. Novak*, 453 So. 2d 1116, 1119 (Fla. 1984) ("The clause, 'arising out of the use of a motor vehicle,' is framed in such general, comprehensive terms in order to express the intent to effect broad coverage.") (citation omitted).

As for the second highlighted phrase, "use of any auto," that language is quite expansive as well.  The term "use" in this context certainly encompasses the act of driving a vehicle, a point which Ms. Chafin unsurprisingly does not contest.  And the phrase "*any* auto" is likewise sweeping in nature since it is not confined to a particular type of vehicle (such as a car or truck) or a certain type of driver (such as an "insured," which Wilshire's policy requires).  To her credit, Ms. Chafin does not dispute that the vehicles she and Mr. Welker were operating qualified as "autos" as that term is defined in Wilshire's policy and, by extension, StarStone's excess policy.

Against this backdrop, the only "reasonable interpretation" of StarStone's automobile exclusion given the plain and ordinary meaning of its terms is that StarStone's excess policy does not apply to any "liability, damage, loss," etc. "arising out of" the motor vehicle accident involving Ms. Chafin and Mr. Welker.  *See Maxum Indem. Co. v. Wagon Wheel Flea Market, Inc.*, 2016 WL 9525227, at *2 (M.D. Fla. Oct. 28, 2016) (construing a policy stating that it did not cover injuries "arising out of the ownership, maintenance, operation, use, chartering, renting, [or] entrustment to others

---

[7] Although the Florida Supreme Court in *Taurus Holdings* made this observation in construing a non-automobile-related exclusion, other courts have extended this interpretation of the "arising out of" language to automobile exclusions.  *See*, *e.g.*, *Tower Ins. Co. v. Quincy Golden Falcon, Inc.*, 2014 WL 12521341, at *2 (N.D. Fla. Jan. 30, 2014).

. . . of any . . . 'auto'" to "plainly exclude[ ] coverage for *all* auto-related injuries"). The fact that Ms. Chafin averred in the Underlying Lawsuit that her case "*arises out of a tractor-trailer crash*" involving her and Mr. Welker bolsters this conclusion. (Doc. 57-3 at 7) (emphasis added).

In an effort to avoid this outcome, Ms. Chafin contends that StarStone's excess policy is ambiguous when read in conjunction with Wilshire's policy, insofar as the latter policy only disallows coverage if the "auto" at issue was operated by "any insured." (Doc. 57-8 at 53). The fatal defect with this argument, however, is that it wholly ignores the critical caveat in StarStone's excess policy that StarStone's automobile exclusion governs because it differs from Wilshire's automobile exclusion. *See* (Doc. 57-9 at 32) (stating that StarStone's excess policy follows Wilshire's policy "*[e]xcept as otherwise provided by . . . [StarStone's excess p]olicy*"). It bears reiterating in this respect that Ms. Chafin concedes that the StarStone and Wilshire automobile exclusions are not the same. (Doc. 71 at 6–7).

Ms. Chafin alternatively contends that while the "arising out of" language is construed expansively, Florida law still insists that there be "a *causal nexus* between the excluded risk (auto use) and the injury or liability in question." (Doc. 71 at 9) (emphasis added). To buttress this assertion, Ms. Chafin cites the Florida Supreme Court's decision in *Race v. Nationwide Mutual Fire Ins. Co.*, 542 So. 2d 347 (Fla. 1989). In *Race*, the Court relied on an insurance treatise in espousing three "rules" for analyzing an insurer's liability coverage for an act "arising out of the ownership, maintenance, and use of a motor vehicle[.]" *Race*, 542 So. 2d at 349 (citing 6B J.

11

Appleman, *Insurance Law and Practice*, § 4317 (Buckley ed. 1979)).  As pertinent here, these rules included that "[t]he automobile must not merely contribute to cause the condition which produces the injury, but must, itself, *produce* the injury."  *Id*. (emphasis added)*.*

In its subsequent opinion in *Taurus Holdings*, however, the Florida Supreme Court clarified that, in *Race*, it did not deem the clause "arising out of" to be synonymous with proximate cause.  *See Taurus Holdings*, 913 So. 2d at 533.  Instead, the high Court ruled that, under *Race*, all that the "arising out of" language demands is "some level of causation greater than coincidence."  *Id*.  Since *Taurus Holdings*, the greater weight of authority has construed the "arising out of" phrase as merely necessitating some causal connection or some causal relationship rather than proximate cause.  *See*, *e.g.*, *Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc.*, 420 F.3d 1317, 1327 (11th Cir. 2005) (explaining that the Florida courts' interpretation of the clause "arising out of" as indicating a "causal relationship" to the incident "is consistent with the general consensus of other jurisdictions that . . . [this language] requires some causal connection to the injuries suffered, but does not require proximate cause in the legal sense") (internal quotation marks and citations omitted); *Travelers Prop. Cas. Co. of Am. v. H.E. Sutton Forwarding Co., LLC*, 620 F. Supp. 3d 1165, 1171 n.6 (M.D. Fla. Aug. 8, 2022) ("After *Race*, the [Florida] Supreme Court in *Taurus* [*Holdings*], although approvingly citing *Race*, . . . clarified its interpretation of 'arising out of' language in exclusionary clauses.  Th[is c]ourt therefore follows *Taurus*

12

[*Holdings*].”); *Sparta*, 990 F. Supp. 2d at 1368 (“In reviewing exclusionary provisions containing the phrase ‘arising out of,’ Florida courts have concluded that the phrase requires only ‘some level of causation greater than coincidence.’”) (quoting *Martinez v. Citizens Prop. Ins. Corp.*, 982 So. 2d 57, 58 (Fla. Dist. Ct. App. 2008)).  Accordingly, to the extent Ms. Chafin argues that the “arising out of” language in StarStone’s automobile exclusion demands proximate cause, that argument fails.

Ms. Chafin separately contends that StarStone’s automobile exclusion should be construed more narrowly because the goal of StarStone’s excess policy was to afford coverage for certain damages not covered under Wilshire’s policy.  (Doc. 71 at 6–8).  To bolster this contention, Ms. Chafin points to a forty-year-old decision issued by an appellate court in *Morrison Assur. Co. v. R.N. Pyle Mechanical*, 498 So. 2d 487 (Fla. Dist. Ct. App. 1986) (per curiam).  *In Morrison*, the appellate court considered a primary policy and an umbrella policy in assessing the level of coverage for damages caused by an insured when installing a chiller.  *Id.* at 487.  The trial court found that the primary policy was ambiguous and therefore supplied coverage.  *Id*.  The trial court also determined that the “contractual liability for damage to the chiller was not excluded by the umbrella policy and that the intent of that policy was to provide excess coverage for losses or damage covered by the underlying policy.”  *Id*.

On appeal, the appellate court upheld these determinations and, in support, referenced “the maze of coverages and exclusions” involved.  *Id.* at 488.  Notably absent from its discussion, however, was any citation to the specific language in the umbrella policy upon which it relied in rendering its decision.  *Id.*

13

*Morrison* is of no help to Ms. Chafin here. As discussed above, StarStone's automobile exclusion explicitly shields it from liability, damages, loss, etc. "arising out of" the use of "any auto." There is no indication in *Morrison* that the umbrella policy in that action contained a similarly expansive exclusion. Indeed, it is not at all clear from the opinion the particular justification which led the court to find that the umbrella policy did not insulate the insurer from paying for damages to the chiller under the policy.

Ms. Chafin next contends that StarStone's automobile exclusion is "ambiguous as applied" because it does not specifically preclude the negligence claims which she apparently believes are in play, such as "negligent entrustment," negligent "fail[ure] to have proper safety protocols," and negligent "fail[ure] to monitor or supervise." (Doc. 71 at 10–11). To buttress this contention, Ms. Chafin points to the "Abuse and Molestation" exclusion in StarStone's excess policy, which lists various categories of negligent claims it does not cover. *Id.* at 11. This argument is also unavailing

Contrary to Ms. Chafin's theory, StarStone's automobile exclusion is not reasonably susceptible to more than one construction simply because it does not catalog the universe of excluded claims. *See Tower Ins. Co.*, 2014 WL 12521341, at *2–3 (finding that a similar auto exclusion barred the plaintiff from obtaining damages arising out of a car accident due to the defendant's alleged negligence in furnishing alcohol to the insured driver, even though the exclusion did not state it encompassed such a negligence claim); *Ohio Cas. Ins. v. Cont'l Cas.*, 279 F. Supp. 2d 1281, 1284 (S.D. Fla. 2003) (deciding that an analogous auto exclusion forecloses coverage for a car

14

accident, in which the negligent maintenance of the roadways was at issue, despite the fact that the exclusion did not mention claims concerning this type of negligence). Indeed, at least one other court in this Circuit has expressly rejected the line of argument advanced by Ms. Chafin here, stating:

> [T]he court finds the exclusionary language at issue clear on its face and declines to hold that the insurer's omission of negligent supervision claims from the list of excluded actions enumerated within the "auto" exclusion creates any ambiguity concerning the coverages extended. [The court] therefore finds no basis to invoke the general precept of policy construction governing interpretation of policy ambiguities and finds the negligence supervision claim expressly excluded.

*Fid. & Cas. Co. of N.Y. v. Lodwick*, 126 F. Supp. 2d 1375, 1381 (S.D. Fla. 2000) (footnote omitted).

Ms. Chafin next contends that she should be permitted to recover monies from StarStone under the "concurrent cause doctrine" because her claimed injuries resulted from several "independent acts of alleged negligence," which were "factually and legally separable from auto operation." (Doc. 71 at 10). The concurrent cause doctrine provides that coverage may exist under an "insurance policy when the loss can be attributed to multiple causes [for the incident in question], 'as long as one of the causes is an insured risk.'" *Guideone Elite Ins. Co.*, 420 F.3d at 1329–30 (quoting *Am. Surety & Cas. Co. v. Lake Jackson Pizza, Inc.*, 788 So. 2d 1096, 1100 (Fla. Dist. Ct. App. 2001) (per curiam)); *see also Sebo v. Am. Home Assur. Co., Inc.*, 208 So. 3d 694, 698 (Fla. 2016) (observing that the concurrent cause doctrine affords coverage "where an

insured risk constitutes a concurrent cause of the loss even when it is not the prime or efficient cause") (citations omitted).  To prevail under the concurrent cause doctrine, however, the multiple causes must "involve a separate and distinct risk" and cannot be "related and dependent."  *Guideone Elite Ins. Co.*, 420 F.3d at 1330 (quoting *Transamerica Ins. Co. v. Snell*, 627 So. 2d 1275, 1276 (Fla. Dist. Ct. App. 1993)).  Causes are deemed to be "dependent" where "one peril instigates or sets in motion the other." *Id*. (quoting *Paulucci v. Liberty Mut. Fire Ins. Co.*, 190 F. Supp. 2d 1312, 1319 (M.D. Fla. 2002)).

The decision in *Lake Jackson Pizza, Inc.* is instructive in this regard.  In that case, one of the insured's employees was part of an automobile accident which severely injured an infant in another vehicle.  788 So. 2d at 1097–98.  The complaint against the insured alleged that the insured was vicariously liable for its employee's negligence and was also directly liable for negligently hiring, supervising, and training the employee. *Id.* at 1097.  The insurer denied coverage based on an automobile exclusion in the insured's policy, which stated that the policy did not extend to bodily injury "arising out of the ownership, maintenance, use[,] or entrustment to others of any . . . 'auto' . . . owned or operated by or rented or loaned to any insured." *Id.*  The trial court ruled against the insurer, predicated, in part, on the concurrent cause doctrine. *Id*. at 1098.  The trial court "found that the efficient cause of the loss was the active negligence of [the insured], and that but for the active negligence of [the insured] the car crash, which was the other concurring cause of the subject loss, would not have occurred." *Id*.

16

On appeal, the appellate court rejected this ruling by the trial court. *Id.* at 1100. It explained:

> [The concurrent cause] doctrine is applicable only when the multiple causes are not related and dependent, and involve a separate and distinct risk. In this case, the alleged multiple causes are related and dependent. The risk that was created by the alleged corporate policies and practices of [the insured employer] was the risk of injury arising out of the use of an automobile. Accordingly, there was no separate and distinct risk.

*Id.* at 1100.

Similarly, in *Ohio Cas. Ins. Co.*, a district court was asked to resolve an insurance dispute that stemmed from a car accident involving a driver of a vehicle owned by a property owner's association on a roadway maintained by the association. 279 F. Supp. 2d at 1282. Two of the association's insurers disputed coverage on the ground that any liability they had under their respective policies arose out of the "ownership, maintenance, use[,] or entrustment to others" of an automobile, which was excluded under the policies. *Id.* at 1283. The district court agreed, and in doing so dismissed an argument by the plaintiff under the concurrent cause doctrine that the "alleged negligent maintenance of the roadway was itself sufficient to cause the accident." *Id.* at 1284. The district court reasoned that "[s]ince the loss would not have occurred but for the use of the motor vehicle," the plaintiff's invocation of the concurrent cause doctrine failed. *Id.*

Here, Ms. Chafin maintains that the concurrent cause doctrine enables her to recover damages from StarStone notwithstanding StarStone's automobile exclusion because, in the Underlying Lawsuit, she averred multiple independent acts of

17

negligence against Golf Argonomics and Sand & Hauling.  As alluded to earlier, for example, Ms. Chafin asserted that Golf Argonomics and Sand & Hauling were liable for negligently hiring, training, and supervising Mr. Welker, and that they breached their duty to engage in a joint venture only with safe and competent contractors by retaining Flash Trucking and Mr. Welker.  (Doc. 57-3 at 21–28).

Even if these alleged acts of negligence were partially responsible for the motor vehicle accident between Ms. Chafin and Mr. Welker, the fact remains that Ms. Chafin's damages still "would not have occurred but for the use" of an automobile. *Ohio Cas. Ins. Co.*, 279 F. Supp. 2d at 1284.  This makes Ms. Chafin's additional claims for negligence "related and dependent" to the car accident which injured her.  *See id.*; *Guideone Elite Ins. Co.*, 420 F.3d at 1330.  Put differently, the risk that was created by the alleged practices of Golf Argonomics and Sand & Hauling was the risk of injury "arising out of" Mr. Welker's operation of the semi-truck.  *Lake Jackson Pizza, Inc.*, 788 So. 2d at 1100.  As summed up by one court in this Circuit:

> Other factors almost always contribute to an automobile crash, but that does not render the automobile itself irrelevant or indicate that the crash did not "arise out of" use of the automobile.  No matter what else contributed to this injury—no matter what else the injury arose out of— the inescapable fact is that the injury also arose out of the use of an automobile.

*Tower Ins.*, 2014 WL 12521341, at *3.  In light of this authority, I find that the concurrent cause doctrine is inapplicable here.[8]

---

[8] There is a separate argument that irrespective of the concurrent cause doctrine, a policy holder generally cannot invoke coverage for an auto accident under both a general liability policy and an

Lastly, Ms. Chafin contends that StarStone's automobile exclusion violates public policy and is therefore void. (Doc. 71 at 12–13). In support of this argument, Ms. Chafin asserts, inter alia, that "[a]llowing exclusions that bar coverage for . . . [the] active negligence [of an employer] effectively punishes injured claimants for the employer's mismanagement by stripping insurance coverage" and that "public policy disfavors contractual provisions that allow a wrongdoer to escape responsibility for preventable harm caused by their own negligence," which leaves victims "without recourse when the harm resulted from the insured's failure to hire and oversee employees properly[.]" (Doc. 71 at 13). This contention is unpersuasive as well.

As a general matter, "a public policy argument for disregarding an unambiguous contractual provision . . . typically fail[s]." *Maxum Indem. Co.*, 2016 WL 9525227, at *4 (M.D. Fla. Oct. 28, 2016) (citation omitted); *see also Safer*, 317 F. Supp. 2d at 1354–55 (rejecting a public policy consideration that would have afforded coverage where there was no gap in coverage). Ms. Chafin does not present a sufficient reason for departing from this practice in this case. This is especially true since general liability policies—such as Wilshire's and StarStone's policies here[9]—usually do not furnish auto liability coverage. *See Safer*, 317 F. Supp. 2d at 1354 (observing that

---

automobile insurance policy "simply by alleging the separate tort of negligent hiring, supervision, and/or retention." *Muzzio v. Auto-Owners Ins. Co.*, 799 So. 2d 272, 274 (Fla. Dist. Ct. App. 2001) (citation omitted).

[9] StarStone describes both its excess policy and Wilshire's policy as "general liability" policies. *See* (Doc. 70 at 21) (noting that Golf Argonomics and Sand & Hauling "purchased one layer of automobile liability coverage and two layers of commercial general liability coverage"). Ms. Chafin does not seem to dispute this characterization.

19

courts have normally "been reluctant to find duplicate coverage under" general liability and automobile policies) (quoting *Farrer v. U.S. Fid. & Guar. Co.*, 809 So. 2d 85, 94 (Fla. Dist. Ct. App. 2002)).  As the court in *Farrer* explained, "[a]n automobile policy protects its insured for liability arising out of the use of that vehicle, while the general liability excludes coverage arising from the use of the vehicle."  *Farrer*, 809 So. 2d at 94; *see also Tower Ins.*, 2014 WL 12521341, at *3 ("Automobile coverage is typically sold separately from general[ ]liability coverage.").

Consistent with this case authority, it is uncontested that Golf Argonomics and Sand & Hauling had an automobile policy with Progressive and general liability policies (with automobile exclusions) with Wilshire and StarStone.  (Doc. 71 at 3).  As a result, there was no gap in coverage, and I discern no legally cognizable basis on which StarStone's automobile exclusion violates public policy.

B.

As discussed at the outset, StarStone posits that its excess policy does not afford coverage to Golf Argonomics and Sand & Hauling for claims arising out of the Chafin/Welker accident or asserted in the Underlying Lawsuit because the final consent judgments in that underlying action did not allocate monies to be paid by each defendant or determine the percentage of liability for each defendant.  (Doc. 57 at 12–13); (Doc. 70 at 23–24).  Ms. Chafin disagrees.  (Doc. 71 at 13–15).

Under Florida law, the party seeking insurance coverage bears the initial burden of demonstrating that "a settlement or judgment represents damages that fall within the coverage provisions of the insurance policy."  *QBE Specialty Ins. Co. v. Scrap Inc.*,

20

806 F. App'x 692, 695 (11th Cir. 2020) (per curiam) (citations omitted)).  As such, the party seeking recovery ordinarily must allocate any settlement amounts between covered and noncovered claims.  *See Keller Indus., Inc. v. Emps. Mut. Liab. Ins. Co. of Wis.*, 429 So. 2d 779, 780 (Fla. Dist. Ct. App. 1983) ("We affirm the final judgment upon a holding that . . . the party claiming coverage . . . had the burden, which it failed to carry, to apportion damages and [to] show that the settlement, or portions thereof, represented costs that fell within the coverage provisions of the policy[.]") (citations omitted); *Am. Cas. Co. of Reading Penn. v. Health Care Indem., Inc.*, 613 F. Supp. 2d 1310, 1320 (M.D. Fla. 2009) ("Where the judgment includes elements for which an insurer may be liable as well as elements beyond the coverage of the policy, the burden of apportioning the damages is on the party seeking to recover from the insurer.") (quoting *Guarantee Ins. Co. v. Gulf. Ins. Co.*, 628 F. Supp. 867, 870 (S.D. Fla. 1986), *aff'd*, 811 F.2d 610 (11th Cir. 1987)).  If an insured does not designate the components of a judgment attributable to covered and uncovered damages, that failure is "generally fatal to its indemnification claim."  *QBE Specialty Ins. Co.*, 806 F. App'x at 695 (citation omitted).  That said, the burden of apportioning between covered and uncovered damages in a general jury verdict may be shifted to the insurer where "the insurer did not adequately make known to the insured the availability and advisability of a special verdict."  *Id*. (citation omitted).

In this case, as referenced previously, the final consent judgments set forth only the total awards for Ms. Chafin and her minor sons without assigning specific sums to each defendant.  (Docs. 57-4, 57-5, 57-6).  As a result, it seems that StarStone could be

21

subjected to liability for those damages attributable to Flash Trucking and OST, which were not insured by StarStone under its excess policy.  This, in turn, could require StarStone to pay out monies beyond the scope of its policy.

The parties quarrel, however, as to whether StarStone was notified of the settlement, such that it was obligated to make known to its insureds "the availability and advisability" of allocating the damages amongst the defendants. *QBE Specialty Ins. Co.*, 806 F. App'x at 695 (citation omitted); *compare* (Doc. 76 at 9) (describing Ms. Chafin's claims that StarStone was "apprised" of the settlement as "a stretch, at best, as StarStone had to metaphorically 'beat down doors' to get information on the underlying litigation") *with* (Doc. 71 at 14) (articulating Ms. Chafin's position that StarStone's "failure to make known to the parties that it wanted . . . judgments segregating damages among the claims [StarStone] contended were covered and not covered is fatal to [StarStone's] argument").

Given this factual dispute between the parties, I respectfully recommend that the Court leave the matter for another day regardless of whether it grants StarStone's motion for judgment on the pleadings.

## C.

One of the forms of relief that StarStone seeks in its complaint is a declaratory judgment stating it had no duty to defend or indemnify any claims arising out of the Chafin/Welker accident or asserted in the Underlying Lawsuit.  (Doc. 57 at 11–13). This request is well-founded.

It is well established that the duty to defend is broader than the duty to indemnify, such that if an insurer has no duty to defend the insured it also has no duty to indemnify. *See Burlington Ins. Co. v. Normandy Gen. Partners*, 560 F. App'x 844, 847–48 (11th Cir. 2014) (per curiam) (citations omitted) ("If . . . the insurer had no duty to defend the insured, it necessarily follows that it had no duty to indemnify.") (citation omitted); *Wellcare of Fla., Inc. v. Am. Int'l Specialty Lines Ins. Co.*, 16 So. 3d 904, 906 (Fla. Dist. Ct. App. 2009) ("[T]he duty to indemnify is narrower than the duty to defend and thus cannot exist if there is no duty to defend."). A duty to defend turns on whether the allegations in the complaint in the underlying suit bring the case within the scope of coverage under the policy in question.[10] *See Wellcare of Fla., Inc.*, 16 So. 3d at 906 (citation omitted); *see also Composite Structures, Inc. v. Cont'l Ins. Co.*, 560 F. App'x 861, 864 (11th Cir. 2014) (noting that a duty to defend "is determined solely from the allegations in the complaint against the insured, not by the actual facts of the cause of action against the insured, the insured's version of the facts or the insured's defenses") (internal quotation marks omitted). And if "there is no contractual duty to defend in the parties' contract[,] then there is no duty to defend." *Allstate Ins. Co. v. RJT Enters., Inc.*, 692 So. 2d 142, 144 (Fla. 1997).

In this case, StarStone's excess policy states that it "will not be required to assume charge of the investigation of *any* claim or defense of *any* suit against an

---

[10] This principle is often called the "eight corners rule" because it limits a court's inquiry to the four corners of the complaint and the four corners of the policy. *Addison Ins. Co. v. 4000 Island Blvd. Condo. Assoc., Inc.*, 721 F. App'x 847, 854 (11th Cir. 2017) (per curiam); *see also Mt. Hawley Ins. Co. v. H&M Builders, LLC*, 711 F. Supp. 3d 1373, 1378–79 (S.D. Fla. Jan. 11, 2024) (citations omitted).

Insured."  (Doc. 57-9 at 34) (emphasis added).  By its plain language, StarStone did not have a duty to defend in the Underlying Lawsuit.  *See Nat'l Union Fire Ins. Co. v. Travelers Ins. Co.*, 214 F.3d 1269, 1272 (11th Cir. 2000) ("In apportioning contractual responsibilities among multiple insurers, this court has recognized that Florida law is quite clear that the parties' intent is to be measured solely by the language of the policies unless the language is ambiguous.") (internal quotation marks and citation omitted).  Ms. Chafin neither addresses this language in StarStone's excess policy, nor demonstrates how StarStone's duty to defend could have otherwise been triggered.  *See* (Doc. 71 at 15–16).

IV.

Based upon the foregoing, I respectfully recommend that the Court grant StarStone's motion for judgment on the pleadings (Doc. 70) as detailed herein.

Respectfully submitted this 10th day of January 2026.

HONORABLE CHRISTOPHER P. TUITE
United States Magistrate Judge

<u>**NOTICE TO PARTIES**</u>

A party has fourteen (14) days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.  A party's failure to file written objections, or to move for an extension of time to do so, waives

24

that party's right to challenge on appeal any unobjected-to factual finding(s) or legal conclusion(s) the District Judge adopts from the Report and Recommendation.  *See* 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1).

Copies to:
Honorable William F. Jung, United States District Judge
Counsel of Record